UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ENVIRONMENTAL ENERGY SERVICES, INC., | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:11-CV-0039 (JCH) |
| | : | |
| v. | : | |
| | : | |
| CYLENCHAR LIMITED, DR. PETER HURLEY | : | OCTOBER 11, 2011 |
| Defendants. | : | |
| | : | |

**RULING RE: DEFENDANT'S MOTION TO DISMISS AND
COMPEL ARBITRATION (Doc. No. 20) AND MOTION TO FILE SUR-REPLY
(Doc. No. 34)**

## I.   INTRODUCTION

Plaintiff, Environmental Energy Services, Inc. ("EES"), brings this action against Cylenchar Limited ("Cylenchar") and Dr. Peter Hurley individually (together, "defendants"). EES alleges that Dr. Hurley, both individually and as a director of Cylenchar made fraudulent or negligent misrepresentations to EES with regard to a patent that Cylenchar and EES had previously agreed to promote together. In addition, EES seeks damages for unjust enrichment and claims the defendants violated the Connecticut Unfair Trade Practices Act.

Defendants move this court to dismiss the claims and compel arbitration (Doc. No. 20). While the Motion was pending, EES filed a Motion to File a Sur-Reply (Doc. No. 34). For the following reasons, the defendants' Motion is granted in part and denied in part, and EES's Motion is granted.

1

**II.    FACTUAL BACKGROUND[1]**

From 2005 until 2008, EES marketed a technology for the removal of mercury from coal-fired utility exhaust gases pursuant to an exclusive license from Solucorp Industries, Ltd. ("Solucorp"),. Amd. Compl. at ¶ 9. Hurley, who owned the United States Patent for this technology, had assigned the technology to Solucorp. Id. During this time period, EES became acquainted with Hurley. Id.

Around the same time, Hurley was developing a second generation technology for eliminating mercury from the exhaust gases emitted from coal-fired boilers. See id. at ¶ 12. Hurley filed provisional patent applications for this technology in January and February 2008, and a United States Patent Application in January 2009 ("Patent 2"). Id. Hurley suggested to EES that EES could partner with him in marketing Patent 2. Id. at ¶ 13. On December 8, 2008, EES entered into a Memorandum of Understanding ("MOU") with Cylenchar, an entity controlled by Hurley, relating to the formation of a joint venture between the two companies to promote Patent 2 in North America and worldwide. See id. at ¶¶ 13–14. The parties subsequently extended the MOU until March 31, 2010. See Amd. Compl. at ¶ 21.

In April 2010, EES went forward with a test that it had arranged to study the Patent 2 technology on a full size boiler ("the SRI Test"). See id. at ¶ 19. Hurley traveled to the United States from the United Kingdom from April 22–30, 2010 and participated in the SRI Test, with all of Hurley's expenses being paid by EES. Id. at 23. During the SRI Test, Hurley told EES personnel that "we will all get rich" due to the technology, and showed pictures of the yacht he planned to purchase with the profits

---

[1] For the purposes of a motion to dismiss, the court takes the factual allegations in the Complaint as true, and draws all reasonable inferences in favor of the plaintiff.

from Patent 2.  See id. at ¶ 24.  The SRI Test showed that the Patent 2 technology was very effective.  See id. at ¶ 25.  The United States Patent Office informed Hurley on April 20, 2010, that the claims of Patent 2 had been allowed, and ultimately issued the patent in August 2010.  See id. at ¶ 26.

On May 7, 2010, Hurley assigned his ownership of Patent 2 to Cylenchar, and he emailed EES, proposing to create a "blank canvas from which [they] could both possibly work in the future" and "formally terminat[e] the Memorandum of 8 December 2008." See id. at ¶ 28.  EES responded with several requests to set terms for EES's participation in exploiting the Patent 2 technology.  See id. at ¶ 30.  Hurley did not respond to these requests.  See id. at ¶ 31.

On May 10, 2010, Hurley urged EES, via email, to continue seeking funding to finance the exploitation of Patent 2.  See id. at ¶ 32.  On May 17, 2010 Hurley emailed to EES that the SRI Test results gave "enough data to show that we have a market killer if it ever comes to a price war." Id.

EES continued to market the Patent 2 technology, and it also arranged for an in-plant trial in July 2010.  See id. at ¶ 33.  As part of this effort, EES presented Hurley with a nondisclosure agreement.  Id.  On July 26, 2010, Hurley refused to sign the agreement and sent a cease and desist email to EES, instructing EES that it should not undertake any further efforts with regard to the Patent 2 technology.  Id.

## III. STANDARD OF REVIEW

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court takes the allegations of a complaint as true and construes them in a manner favorable to the plaintiff.  See, e.g., Hoover v. Ronwin, 466 U.S. 558, 587 (1984); Phelps v. Kapnolas,

3

308 F.3d 180, 184 (2d Cir. 2002). The court must draw all reasonable inferences in the plaintiff's favor. See, e.g., Yung v. Lee, 432 F.3d 142, 146 (2d Cir. 2005).

When a motion to dismiss is premised upon a request to compel arbitration, however, the court "applies a standard similar to that applicable for a motion for summary judgment." See Santos v. GE Capital, 397 F.Supp.2d 350, 353 (D.Conn. 2005) (quoting Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003)). The question of whether parties agreed to arbitrate is to be decided by the court; however, if an issue of fact exists with regard to the whether the parties made such an agreement, a trial on that issue is necessary. See Bensadoun, 316 F.3d at 175.

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009). Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Id. In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d

4

255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  <u>Beyer v. County of Nassau</u>, 524 F.3d 160, 163 (2d Cir.2008) (quoting <u>Guilbert v. Gardner</u>, 480 F.3d 140, 145 (2d Cir. 2007)); <u>see also</u> <u>Havey v. Homebound Mortg., Inc.</u>, 547 F.3d 158, 163 (2d Cir. 2008) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986)) (stating that a non-moving party must point to more than a mere "scintilla" of evidence in order to defeat a motion for summary judgment).

## IV. DISCUSSION

### A. Arbitration

The Federal Arbitration Act ("FAA") provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . .  shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The FAA reflects "both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract."  <u>AT&T Mobility LLC v. Concepcion</u>, 131 S.Ct. 1740, 1745 (2011) (internal quotation marks and citations omitted).  "[T]he FAA was enacted to replace judicial indisposition to arbitration, and is an expression of a strong federal policy favoring arbitration as an alternative means of dispute resolution."  <u>Ross v. American Express Co.</u>, 547 F.3d 137, 142 (2d Cir. 2008) (internal quotation marks and citations omitted).

At the same time, arbitration "is a matter of consent, not coercion."  <u>Id.</u> at 143 (quoting <u>Volt Info. Scis. v. Bd. of Trs. Of Leland Stanford Junior Univ.</u>, 489 U.S. 468,

479 (1989)).  Because arbitration is a matter of contract, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  Id.  "Persons are generally entitled to have their dispute settled by the ruling of a court of law.  It is essentially only by making a commitment to arbitrate that one gives up the right of access to a court of law in favor of arbitration."  Sokol Holdings, Inc. v. BMB Munai, Inc., 542 F.3d 354, 358 (2d Cir. 2008) (citation omitted).  "While the FAA expresses a strong federal policy in favor of arbitration, the purpose of Congress in enacting the FAA was to make arbitration agreements as enforceable as other contracts, but not more so."  Cap Gemini Ernst & Young, U.S., LLC v. Nackel, 346 F.3d 360, 364 (2d Cir. 2003) (emphasis in original) (internal quotation marks and citation omitted).  "[C]ourts must place arbitration on an equal footing with other contracts, and enforce them according to their terms."  AT&T Mobility LLC, 131 S.Ct. at 1745 (citations omitted).

When determining whether to compel arbitration pursuant to the FAA, a court looks to four factors: (1) whether the parties agreed to arbitrate their dispute; (2) whether the asserted claims fall within the scope of the arbitration agreement; (3) whether Congress intended the federal statutory claims asserted by the plaintiff, if any, to be non-arbitrable, and (4) if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the remaining claims pending arbitration.[2]  See JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 169 (2d Cir. 2004).

---

[2] Neither party has briefed the issue of whether the individual claim against Dr. Hurley should be stayed pending arbitration.

6

1.      Agreement to Arbitrate

To answer the question of whether the parties agreed to arbitrate a certain matter, the court looks to the "principles that govern the formation of contracts" under the law governing the contract. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). In the case at bar, the contract provides that the contract is to be governed by English law. MOU at ¶ 14.2. Typically, courts give substantial weight to choice of law provisions. See Phillips v. Audio Active Ltd., 494 F.3d 378, 384 (2d Cir. 2007). Though a choice of laws issue exists here, the parties have not contended that principles of contract interpretation under English law differ from those principles under common law. Accordingly, the court looks to common law principles to interpret the MOU.[3] See id. at 386 (applying general contract law principles where parties have failed to construe a contract clause under English law in their briefs).

A court must construe a contract to effectuate the intent of the parties, as determined by the language the parties used in the contract. See Creatura v. Creatura, 122 Conn. App. 47, 51–52 (Conn. App. 2010). The court must interpret the language of a contract through the "common, natural, and ordinary meaning" of the language. Id. at 52. Where the language of a contract is clear and unambiguous, in that it "conveys a definite and precise intent," the court must give effect to the contract according to its terms. Id. The determination of whether a contract is ambiguous is a matter of law. See id.

The MOU, executed by both EES and Cylenchar, provides:

In the event that for any reason a definitive Joint Venture Agreement between [Cylenchar] and EES has not been executed and delivered by January 31, 2009

---

[3] Cylenchar attached a copy of the English Arbitration Act to its Motion, see Mem. Supp. Mot. to Dismiss, Ex. B, and suggests it is "remarkably similar to [the FAA]." Id. at 11.

7

> or such later date as [Cylenchar] and EES may agree in writing, either party may elect, by written notice to the other party, to terminate this Memorandum without liability on the part of either party or obligations with respect to the subject matter thereof, except that agreements in [certain paragraphs] shall survive such termination.

MOU at ¶ 10.3.  The parties later agreed in writing to extend this date until March 31, 2010, and also agreed that all other terms and conditions remained unchanged.  See Amd. Compl at ¶ 18; Def.'s Reply, Ex. A.  EES contends that, pursuant to this language and the fact that the parties did not agree to any further extensions, "the MOU expired by its terms on March 31, 2010."  See Amd. Compl. at ¶ 21.  Defendants contend that the MOU remained in effect until May 7, 2010, when Dr. Hurley e-mailed EES to formally terminate the MOU.  See Def.'s Reply at 6; Amd. Compl. at ¶ 28.

EES contends that, at this stage of the litigation, the court must accept all factual allegations as true, including EES's "allegations concerning the expiration of the MOU on March 31."  See Pl.'s Sur-Reply at 1.  This would be the case if the language of paragraph 10.3 was ambiguous and a factual dispute existed regarding the party's intentions.  See Larobina v. First Union Nat'l Bank, 2006 WL 437396, at *2 (Conn. Super. Feb. 1, 2006).  Where the contract language is unambiguous and the parties' intent is clear, however, "contract interpretation is a matter of law for the court to decide."  Id.

Paragraph 10.3 clearly and unambiguously provides that, should the parties fail to reach an agreement regarding a joint venture by a particular date, "either party may elect, by written notice to the other party, to terminate" the MOU.  Accordingly, as a matter of law, the MOU was not terminated until May 7, 2010, when Dr. Hurley, provided written notice that Cylenchar was terminating the agreement, as required by

paragraph 10.3.  Consequently, the gravamen of EES's Amended Complaint is based on conduct that EES alleges took place during a time when the MOU, including the agreement to arbitrate, governed the relationship between the parties.

### 2. Scope of the Arbitration Agreement

In determining the scope of an agreement to arbitrate, the court must first determine whether the arbitration clause at issue is broad or narrow.  See JLM Indus., Inc., 387 F.3d at 172.  Where the arbitration clause is broad, a presumption of arbitrability arises.  See id.  Further, under a broad arbitration clause, claims must be arbitrated "[i]f the allegations underlying the claims 'touch matters' covered by the parties' . . . agreements."  See Paramedics Electromedicina Comercial Ltda. v. GE Med. Sys., 369 F.3d 645, 654 (2d Cir. 2004).  The presumption of arbitrability is only overcome "if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that [it] covers the asserted dispute."  See Oldroyd v. Elmira Sav. Bank, 134 F.3d 72, 76 (2d Cir. 1998) (quoting WorldCrisa Corp. v. Armstrong, 129 F.3d 71, 74 (2d Cir. 1997) (emphasis in original).

Here, the parties agreed to mediate and arbitrate, if necessary, "any dispute, difference or controversy [that] arises out of or in connection with the Joint Venture, [the MOU] or the Joint Venture Agreement."  This language is very similar to language the Court of Appeals has previously classified as broad.  See, e.g., Paramedics Electromedicina Comercial Ltda., 369 F.3d at 654 ("The arbitration agreement here, covering as it does "any controversy, claim or dispute" arising out of the Agreements, is of the broad type."); Oldroyd, 134 F.3d at 76 (finding a clause that makes arbitrable "[a]ny dispute, controversy or claim arising under or in connection with [the employment

agreement]" to be a "prototypical broad arbitration provision"). Accordingly, the arbitration clause at issue here is a broad provision.

As previously discussed, much of the conduct EES alleges in its Amended Complaint occurred while the MOU, including the arbitration clause, was still in effect. See supra Section II.B; Amd. Compl. at ¶¶ 22–27. EES further alleges that, following the termination of the MOU, Hurley encouraged EES through two separate emails to continue seeking financing to exploit Patent 2. Id. at ¶ 32. EES claims that it continued to market the Patent 2 technology through July 2010 without any indication from Hurley that it should cease such activities. Id. at ¶33. These allegations clearly "touch matters" covered by the arbitration agreement in the MOU, namely the parties' joint efforts to exploit the Patent 2 technology. As a result, EES's claims fall within the scope of the broad arbitration provision included in the MOU.

EES does not offer any alternative interpretation of the arbitration clause. Instead, EES argues that the arbitration clause had expired prior to the conduct it alleges. See Pl.'s Mem in Opp. at 10–15; Pl.'s Sur Reply Mem. in Opp. at 1–2. The court rejects that argument. See supra Section A.1. Consequently, EES fails to overcome the presumption of arbitrability that applies to broad arbitration provisions.

### 3. Congress's Intentions Regarding Arbitrability

Neither party here argues that Congress has intended that the claims at issue here are nonarbitrable. In fact, it is clearly established that both Connecticut statutory and common law claims are arbitrable. See JLM Indus., Inc. at 182; Discount Trophy & Co. v. Plastic Dress-Up Co., 2004 WL 350477, at *3 n. 5 (D.Conn. Feb. 19, 2004)

(collecting cases). Consequently, all of EES's claims against Cylenchar are subject to arbitration.

        4.        Forum for Arbitration

A district court "may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." 9 U.S.C. § 206. The MOU provides that "the seat, or legal place, or arbitration shall be London, United Kingdom." MOU at ¶ 13.5. A forum selection clause is presumptively enforceable if it "was communicated to the resisting party, has mandatory force and covers the claims and parties involved in the dispute." See Phillips v. Audio Active Ltd., 494 F.3d 378, 383 (2d Cir. 2007). To overcome this presumption, the resisting party must make "a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" Id. at 383–84 (quoting M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972).

Here, the forum selection clause is presumptively enforceable. EES's President, Richard Nowak, initialed each page of the MOU, clearly demonstrating that the forum selection clause was communicated to EES. The clause itself is mandatory, indicating that "the seat . . . of arbitration shall be in London, United Kingdom." MOU at ¶ 13.5. Finally, it is clear that the clause covers the parties involved in this dispute, namely EES and Cylenchar.

As discussed above, EES argues that the arbitration provision is not binding on this dispute. As a result, EES fails to present any argument that enforcement of the forum selection clause would be unreasonable or unjust. Consequently, EES fails to

overcome the presumption of enforceability. In accordance with the forum selection clause, arbitration must take place in London, United Kingdom.

B.   Individual Liability

EES alleges claims against Dr. Peter Hurley individually, as well as against Cylenchar. See Amd. Compl. Defendants argue that, at all times, Hurley acted as a representative of Cylenchar, rather than in his individual capacity, and that EES has failed to allege any facts that would warrant piercing the corporate veil of limited liability. Mem. Supp. Mot. to Dismiss at 15–16. In response, EES argues that it properly asserts claims against Hurley individually because Hurley, individually, was the owner of the Patent 2 technology until May 7, 2010, when he assigned ownership to Cylenchar. Pl.'s Mem. in Opp. at 17.[4]

It is well established in Connecticut that "a director or officer who commits [a] tort or who directs the tortious act done, or participates or operates therein, is liable to third persons injured thereby, even though liability may also attach to the corporation for the tort." See Sturm v. Harb Dev. LLC, 298 Conn. 124, 132–33 (2010) (citations omitted). In such a case, the imposition of individual tort liability does not require piercing of the corporate veil. See id. at 133. Similarly, a director may also be held personally liable for tortious acts under CUTPA, see Cohen v. Roll-A-Cover, LLC, 131 Conn. App. 443, 468–69 (Conn. App. 2011), as well as for unjust enrichment. See, e.g., Wilcox v. Schmidt, 2005 WL 2082745, at *2 (Conn. Super. Aug. 2, 2005) (quoting Fink v. Golenbock, 238 Conn. 183, 210 (1996). Taking the facts as asserted by EES, EES properly states a claim that Hurley is individually liable for any misrepresentations he

---

[4] In its Opposition, EES states that this transfer occurred on May 7, 2011. In reliance on the dates in the Amended Complaint, the court believes this is a typographical error, and the actual date of transfer was May 7, 2010. See Amd. Compl. at ¶ 28(a).

made as a director of Cylenchar during this period.

**V.     CONCLUSION**

For the foregoing reasons, the court grants defendant's Motion to Compel Arbitration with regard to all of EES's claims against Cylenchar.  The court denies defendant's Motion to Dismiss with regard to Dr. Hurley, individually.

The court hereby orders EES to advise the court within fourteen days of any objection to stay the claims against Hurley individually by administratively closing the case without prejudice to reopen, pending arbitration.  Defendants shall have seven days following EES's filing to respond.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 11th day of October, 2011.

                                           /s/ Janet C. Hall
                                          Janet C. Hall
                                          United States District Judge